**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SELWYN MILLS,** | : | |
| **Plaintiff** | : | **No. 1:20-cv-00266** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **DR. COURTNEY ROGERS, <u>et al.</u>,** | : | |
| **Defendants** | : | |

<u>**MEMORANDUM**</u>

Before the Court is Defendants' motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Doc. No. 119.)  For the reasons set forth below, the Court will grant the motion insofar as Defendants seek summary judgment on Plaintiff's claims asserted under 42 U.S.C. § 1983.  In addition, the Court will decline to exercise jurisdiction over Plaintiff's remaining state-law claim for breach of contract and dismiss that claim.

I.      **BACKGROUND**

   A.      **Procedural Background**

Plaintiff Selwyn Mills ("Plaintiff") is a former inmate of the Pennsylvania Department of Corrections ("DOC").  (Doc. No. 1 at 1, 6.)  He currently resides in Schenectady, New York.  (Doc. No. 125 at 1.)

On February 14, 2020, while Plaintiff was incarcerated at State Correctional Institution Mahanoy ("SCI Mahanoy")[1] in Frackville, Pennsylvania (Doc. No. 1 at 1, 23), he commenced this action by filing a pro se complaint pursuant to 42 U.S.C. § 1983 ("Section 1983"), naming the following individuals as defendants: Dr. Courtney Rodgers ("Dr. Rodgers"), incorrectly identified in the complaint as "Rogers"; Dr. Mahendra Pujara ("Dr. Pujara"); Dr. Chesonis;

---

[1]  For ease of reference, the Court will refer to the DOC's State Correctional Institutions as an "SCI."

Health Services Administrator G. Travers ("Travers"); and six (6) John/Jane Doe Defendants (id. at 1–3). Subsequently, however, Plaintiff voluntarily dismissed the "New York Defendants," whom he identified as Travers and four (4) John/Jane Does, as defendants. (Doc. No. 32 at 1.)

In the complaint, Plaintiff asserted violations of his rights under the Eighth and Fourteenth Amendments in connection with the treatment of his prostate cancer while he was incarcerated at SCI Mahanoy and then subsequently transferred to correctional institutions in New York. See (Doc. No. 1 at 13–14 (asserting, inter alia, that: (1) the defendants from SCI Mahanoy failed to (a) stay his transfer to New York correctional institutions until he received curative treatment, (b) relay all his medical information to the receiving institutions, and (c) maintain custody and control of his medical records; and (2) the defendants from New York violated his rights in the same way)). On February 19, 2020, the Court entered an Order which, inter alia, deemed the complaint filed and directed the Clerk of Court to serve a copy of the complaint along with waivers of service on the named defendants. (Doc. No. 7.) In the interest of judicial economy, the Court requested that the named defendants waive service pursuant to Rule 4(d) of the Federal Rules of Civil Procedure. (Id.) The Court also instructed that, if service could not be completed due to Plaintiff's failure to properly name the defendants or provide an accurate mailing address for them, Plaintiff would be required to correct such deficiencies and a failure to do so could result in dismissal of this action. (Id.)

On March 11, 2020, Dr. Pujara returned his waiver of service, and counsel entered an appearance on his behalf. (Doc. Nos. 11, 12.) On April 2, 2020, the Court, after observing that Dr. Rodgers, Dr. Chesonis, and Travers did not waive service, directed the United States Marshals Service to serve the complaint on those Defendants. (Doc. No. 14.) Thereafter, on April 28, 2020, Dr. Pujara filed a motion to dismiss the complaint for failure to state a claim

upon which relief could be granted, as well as a supporting brief.  (Doc. Nos. 18, 19.)  Dr. Rodgers filed an answer to the complaint on June 12, 2020.  (Doc. No. 35.)

The summons that had been issued to Dr. Chesonis was returned to the Court as unexecuted.  (Doc. No. 29.)  As such, the Court ordered Plaintiff to show cause why the Court should not dismiss Dr. Chesonis from this action pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.  (Doc. No. 33.)  Plaintiff timely filed a response to the Order, and after considering his response, the Court concluded that Plaintiff established good cause for why Dr. Chesonis should not be dismissed.  (Doc. No. 37 at 4.)  In addition, the Court directed Dr. Rodgers to file any information that he had concerning Dr. Chesonis's current whereabouts under seal.  (Id. at 5.)

On August 4, 2020, the Court issued a Memorandum and Order denying Dr. Pujara's motion to dismiss the complaint and directing him to file an answer to the complaint within fourteen (14) days.  (Doc. Nos. 38, 39.)  The Court also directed the parties to complete discovery within six (6) months from the date Dr. Pujara filed his answer.  (Doc. No. 39.)  Shortly thereafter, on August 12, 2020, counsel entered appearances on Dr. Chesonis' behalf (Doc. Nos. 40, 41).  On the same date, Dr. Chesonis filed a motion to dismiss the complaint or, in the alternative, a motion for summary judgment, and a supporting brief.[2]  (Doc. Nos. 42, 43.)  Dr. Pujara filed his answer to the complaint on August 18, 2020.  (Doc. No. 48.)

Around this same period, Plaintiff filed a motion seeking leave to file an amended complaint, along with his proposed amended complaint, supporting brief, and various exhibits.  (Doc. Nos. 45 through 47.)  In his proposed amended complaint, which is now the operative complaint in this case, Plaintiff names the following individuals and entity as defendants: Dr.

---

[2]  He later timely filed a statement of material facts.  (Doc. No. 49.)

Rodgers; Dr. Pujara; Dr. Mathew Miceli ("Dr. Miceli"), incorrectly identified in the proposed amended complaint as "Micelli"; PA-C Jenna Williams ("PA Williams"); John Steinhart ("Steinhart"); Carey Ritsko ("Ritsko"); and John Doe, Inc.  (Doc. No. 45-1 at 1.)  Plaintiff once again asserted violations of his Eighth and Fourteenth Amendment rights.  More specifically, he claimed, inter alia, that Defendants demonstrated deliberate indifference in delaying "diagnostic and therapeutic treatment" for his "Stage 3 Prostate Cancer" and violated due process when they failed to seek a "stay and/or discharge from voluntary extradition . . . to a federal out-of-state facility dangerous to his health."  (Id. at 22, 23.)  Plaintiff also asserted a new state-law claim for breach of contract against John Doe, Inc.  (Id. at 21.)

The Court granted Plaintiff's motion to amend his complaint on August 31, 2020, and denied as moot Dr. Chesonis's pending motion to dismiss the original complaint or, in the alternative, motion for summary judgment.  (Doc. No. 53.)  In addition, the Court directed the Clerk of Court to (1) docket Plaintiff's proposed amended complaint as a separate entry (i.e., (Doc. No. 52)); (2) add the following individuals as defendants to the caption of the docket in this case: Dr. Miceli; PA Williams; and John Doe, Inc; (3) substitute Ritsko as Jane Doe #1 and Steinhart as John Doe #1 on the caption of the docket in this case; (4) serve, inter alia, a copy of the amended complaint on the newly named defendants; and (5) terminate Dr. Chesonis as a defendant in this case because Plaintiff had "'mistakenly identified [Dr. Miceli] as Dr. Chesonis.'"  (Id. at 3–4.)

On September 14, 2020, Dr. Pujara filed a motion to dismiss the amended complaint, along with a supporting brief.  (Doc. Nos. 55, 56.)  The following day, Dr. Rodgers filed an answer to the amended complaint.  (Doc. No. 58.)  Thereafter, on September 25, 2020, Steinhart and Ritsko returned their waiver of service, and counsel entered an appearance on their behalf.

(Doc. Nos. 61, 62.)  Three (3) days later, Dr. Miceli, PA Williams, and Wellpath, LLC ("Wellpath") returned their waivers of service, and counsel entered appearances on their behalf. (Doc. Nos. 63–65.)  Notably, counsel for these Defendants stated that they were entering appearances on behalf of "Wellpath (aka John Doe, Inc.)[.]"  (Doc. Nos. 63, 65.)  As a result, the Court directed the Clerk of Court to substitute Wellpath for John Doe, Inc. as a defendant in this case.  (Doc. No. 68.)  Thereafter, on October 30, 2020, Dr. Miceli, PA Williams, Wellpath, Ritsko, and Steinhart filed their respective answers to the amended complaint.  (Doc. Nos. 69, 70.)  In addition, Ritsko and Steinhart filed a motion to take Plaintiff's deposition, which was subsequently granted by the Court.  (Doc. Nos. 71, 72.)

On November 13, 2020, the Court granted Dr. Pujara's motion to dismiss the amended complaint, dismissed Plaintiff's claims against him, and directed the Clerk of Court to terminate him as a defendant in this case.  (Doc. Nos. 73, 74.)  Thereafter, on January 4, 2021, while the parties were engaging in discovery, Plaintiff filed a motion seeking the appointment of counsel. (Doc. No. 78.)  The Court conditionally granted that motion the following day and directed the Clerk of Court to forward a copy of its Order to the Chair of the Federal Bar Association's Pro Bono Committee.  (Doc. No. 79.)  In addition, the Court stayed all filing obligations and deadlines for forty-five (45) days pending the Chair's attempts to find counsel to represent Plaintiff in this matter.  (Id.)

The Chair reported that he had been unsuccessful in locating counsel to represent Plaintiff.  (Doc. No. 80.)  As such, the Court issued an Order on February 18, 2021, lifting the stay.  Following the issuance of that Order, Defendants filed a joint motion seeking an extension of time to complete discovery.  (Doc. No. 85.)  The Court granted this motion and directed the parties to complete discovery by August 13, 2021.  (Doc. No. 86.)

As reflected by the Court's docket, Defendants subsequently sought and obtained
numerous extensions of the discovery deadline. (Doc. Nos. 90–93, 95–98, 102, 103, 105, 106,
109, 110.)[3]  As a result, discovery was not completed in this matter until January 16, 2023, with
a dispositive motions deadline of March 17, 2023.  (Doc. No. 110.)  Moreover, during discovery,
Ritsko and Steinhart filed a motion to compel Plaintiff's deposition.  (Doc. No. 97.)  In support
of the motion, Ritsko and Steinhart asserted that they had attempted to schedule Plaintiff's
deposition by sending him a letter inquiring about available dates, but Plaintiff neither responded
to their letter nor provided them with available dates.  (Id.)  The Court granted this motion to
compel and directed Plaintiff to respond to Ritsko and Steinhart's previously propounded letter
(Doc. No. 98).  Plaintiff was subsequently deposed on July 28, 2022.  (Doc. No. 108-1 at 2.)

During discovery, Ritsko and Steinhart also filed a motion to compel Plaintiff's response
to their requests for production of documents, as well as a supporting brief.  (Doc. Nos. 107,
108.)  In support of their motion, they asserted that they had served Plaintiff with a request to
produce the documents he referenced during his deposition, but he failed to respond to their
request.  (Id. at 4.)  On November 21, 2022, the Court granted this motion and directed Plaintiff
to provide Ritsko and Steinhart with copies of the requested documents on or before December
19, 2022, or, alternatively, certify that they do not exist.  (Doc. No. 110.)

Plaintiff apparently failed to comply with the Court's directive; as such, Ritsko and
Steinhart filed a motion to dismiss the amended complaint for lack of prosecution pursuant to
Rule 41(b) of the Federal Rules of Civil Procedure, followed by a supporting brief.  (Doc. Nos.

---

[3]  One of those motions seeking an extension of the discovery deadline was filed jointly by all
Defendants (Doc. No. 102); another one of those motions was filed collectively by Dr. Rodgers,
Dr. Miceli, PA Williams, and Wellpath (Doc. No. 95); and, finally, the remaining motions were
filed by Ritsko and Steinhart (Doc. Nos. 90, 92, 105, 109).

111, 113.)  Five days after the motion's filing, the Clerk of Court docketed a letter from Plaintiff concerning discovery in this matter.  (Doc. No. 112.)  Because it appeared that Plaintiff filed this letter in opposition to Ritsko and Steinhart's motion to compel discovery, the Court directed these Defendants to respond to the letter.  (Doc. No. 117.)  Consequently, Ritsko and Steinhart filed a response to the letter on March 14, 2023.  (Doc. No. 118.)  They also filed a motion for an extension of time to file a motion for summary judgment, if necessary, after the Court's resolution of their pending motion to dismiss.  (Doc. No. 117.)

On March 31, 2023, following a brief extension of time, Dr. Miceli, Dr. Rodgers, PA Williams, and Wellpath, jointly filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, along with a statement of material facts.  (Doc. Nos. 119, 120.) They later filed a supporting brief.  (Doc. No. 124.)  As reflected by the docket, Plaintiff neither filed a brief in opposition to the motion for summary judgment nor sought an extension of time in which to do so.

On October 20, 2023, the Court issued a Memorandum and Order resolving Ritsko and Steinhart's motion to dismiss the amended complaint for lack of prosecution.  (Doc. Nos. 126, 127.)  After considering and balancing the factors set forth in Poulis v. State Farm Fire and Casualty Co., 747 F.2d 863, 868–70 (3d Cir. 1984), the Court concluded that these factors weighed in favor of dismissing Plaintiff's claims against Ritsko and Steinhart.  (Id.)  However, because the Court also recognized that, inter alia, dismissal with prejudice is a "drastic sanction," Poulis, 747 F.2d at 867, the Court afforded Plaintiff fourteen (14) days to show cause why his claims against Ritsko and Steinhart should not be dismissed with prejudice due to his failure to prosecute.  (Id.)  Ultimately, Plaintiff failed to show such cause or seek an extension of time in which to do so.  As a result, the Court issued an Order on January 23, 2024, dismissing with

prejudice Plaintiff's claims against Ritsko and Steinhart.  (Doc. No. 129.)  In addition, the Court

directed the Clerk of Court to terminate these two (2) Defendants from the caption of this case.

(Id.)

Thus, the remaining Defendants in this action are Dr. Rodgers, Dr. Miceli, PA Williams,

and Wellpath (collectively, "Defendants").  The individual Defendants (i.e., Dr. Rodgers, Dr.

Miceli, and PA Williams) "are all contracted medical services providers to the [DOC]" and are

employed by Wellpath.  (Doc. No. 124 at 1 n.1.)  Defendants seek summary judgment on all

claims.  That said, the Court first turns to the factual background in this matter.

### B.    Factual Background

In accordance with the Court's Local Rules, Defendants filed a statement of material

facts in support of their motion for summary judgment.  (Doc. No. 120.)  Plaintiff did not file a

counter statement of material facts, responding to the numbered paragraphs set forth in

Defendants' statement, as required by the Court's Local Rules.  Thus, Defendants' facts are

deemed admitted because:

> A failure to file a counter-statement equates to an admission of all the facts set forth
> in the movant's statement.  This Local Rule serves several purposes.  First, it is
> designed to aid the Court in its determination of whether any genuine issue of
> material fact is in dispute.  Second, it affixes the burden imposed by Federal Rule
> of Civil Procedure 56(e), as recognized in Celotex Corp. v. Catrett, on the
> nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the
> depositions, answers to interrogatories, and admissions on file, designated specific
> facts showing that there is a genuine issue for trial.' 477 U.S. 317, 324, 106 S.Ct.
> 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted) (emphasis added).

See Williams v. Gavins, No. 13-cv-00387, 2015 WL 65080, at *5 (M.D. Pa. Jan. 5, 2015)

(emphasis in original) (citation omitted), aff'd sub nom. Williams v. Gavin, 640 F. App'x 152

(3d Cir. 2016) (unpublished).  Thus, the undisputed material facts are derived from Defendants'

statement.  The Court recounts the relevant facts from this statement below.[4]

### 1. Plaintiff's Medical Treatment at SCI Mahanoy Until His Transfer to the New York Correctional Institutions

Plaintiff arrived at SCI Mahanoy on December 1, 2016.  (Doc. No. 120 ¶ 10.)  Prior to

this transfer, Plaintiff had a history of elevated prostate-specific antigen ("PSA") levels, which

was noted in his health documentation provided to SCI Mahanoy.[5]  (Doc. Nos. 120 ¶¶ 2–8, 10;

119-2 at 18.)  After he continued to have, inter alia, elevated PSA levels after testing while at

---

[4] Defendants' statement of material facts is largely based on Plaintiff's medical records.  See generally (Doc. Nos. 120; 119-2 (containing "DOC Medical Records")).  Defendants point out that their statement and attached exhibits are not intended to provide a complete recitation of all medical services provided to Plaintiff while he was in DOC custody; rather, they are intended to provide a recitation of the services relevant to Plaintiff's allegations, as well as additional background they deem necessary to provide context for his medical condition.  (Doc. No. 120 ¶ 1.)

    Although the Court appreciates the thorough recitation of material facts supplied by Defendants, this case involves a discrete claim, i.e., whether Defendants violated Plaintiff's constitutional rights when they knew he had been tested for prostate cancer and either (1) obtained the results showing he had cancer and did not notify the correctional facilities in New York about the results, (2) did not attempt to promptly obtain the test results and then notify the correctional facilities in New York about the results, or (3) respond to Plaintiff's e-mail request to obtain the test results, which he allegedly sent from the federal correctional facility in New York.  Thus, this case does not involve the quality of care Plaintiff received while incarcerated at SCI Mahanoy as Plaintiff does not allege he received deficient care prior to his transfer to New York in early November 2017 or when he later returned to SCI Mahanoy in mid-July 2018.  See (Doc. No. 52 ¶¶ 16–71).  Nor could he plausibly allege receiving deficient care because Defendants' statement of material facts and attached medical records show a history of the medical professionals at SCI Mahanoy providing substantial and timely medical care to Plaintiff while he was incarcerated at SCI Mahanoy.  See (Doc. Nos. 120 ¶¶ 10–22, 46–130; 119-2).  Overall, the Court has recounted only the facts forming the basis of Plaintiff's claim against Defendants and the facts necessary to provide sufficient context to this claim.

[5] PSA is "[t]he most commonly used screening blood test" for prostate cancer.  See Prostate Cancer, Merck Manual: Consumer Version, https://www.merckmanuals.com/home/kidney-and-urinary-tract-disorders/cancers-of-the-kidney-and-genitourinary-tract/prostate-cancer?query=prostate%20specific%20antigen (last visited May 24, 2024).  "PSA is a substance produced only by prostate gland tissue."  Id.

SCI Mahanoy (Doc. No. 120 ¶¶ 13–16), Dr. Rodgers placed a consult request for Dr. Pujara, an outside urologist, to see Plaintiff.[6]  (Id. ¶ 17.)  Dr. Rodgers observed that Plaintiff's increased PSA level and risk factors made prostate cancer highly likely.  (Id.)

Plaintiff had an outside urology appointment with Dr. Pujara on August 22, 2017.  (Id. ¶ 18.)  Based on his examination of Plaintiff, Dr. Pujara's plan was to repeat PSA testing in two (2) weeks.  (Id.)  If the PSA test produced an elevated result, Dr. Pujara would consider recommending a biopsy of Plaintiff's prostate.  (Id.)

The PSA test produced an elevated result, which led to Dr. Pujara ultimately performing a prostate biopsy on October 24, 2017.  (Id. ¶¶ 19–21.)  The following day, pathologist Richard Bindie, M.D. ("Dr. Bindie") of Schuylkill Medical Center, authored a report, directed to Dr. Pujara, regarding Plaintiff's prostate biopsy samples.  (Id. ¶ 22.)  Based upon Dr. Bindie's review of the samples, he formed the following diagnoses: (1) Prostate gland, left lobe needle biopsies—focal adenocarcinoma of prostate; and (2) prostate gland, right side needle biopsies—focal infiltrating adenocarcinoma of prostate and focal high-grade pin lesion.  (Id.)  The pathology report was faxed to Dr. Pujara on or about November 1, 2017.  (Id.; Doc. No. 119-2 at 13.)

## 2. Plaintiff's Medical Treatment After Transferring to the New York Correctional Institutions and Actions at SCI Mahanoy During His Incarceration in New York

On November 3, 2017, Plaintiff was transferred from SCI Mahanoy to the Rensselaer County Jail in New York.[7]  (Doc. No. 120 ¶ 24.)  Approximately two months later, Plaintiff was

---

[6]  Dr. Rodgers noted that Plaintiff also had a family history of prostate cancer and had an enlarged prostate (per a rectal exam).  (Doc. No. 120 ¶ 17.)

[7]  On the transfer of health form, it was noted that Plaintiff had a history of, inter alia, prostate issues.  (Id.)

transferred to the Metropolitan Detention Center in Brooklyn, New York ("MDC Brooklyn"). (Id. ¶ 25.)  At the time of his intake, Plaintiff appears to not have revealed any possible issues with his prostate. (Id.)

On January 29, 2018, Dr. Khanum at SCI Mahanoy noted that Plaintiff was on the schedule for chronic care that day.  (Id. ¶ 26.)  Dr. Khanum also noted that Plaintiff was currently on transfer out of state, so he could not be examined that day.  (Id.)  Even so, Dr. Khanum reviewed Plaintiff's chart and noted abnormal labs and possible prostate cancer.  (Id.)  Dr. Khanum observed that a recent oncology report was not in Sapphire.[8]  (Id.)  As a result, Dr. Khanum planned to obtain the consult report and have Plaintiff report to the "MD line" once he returned to SCI Mahanoy.  (Id.)

On February 7, 2018, Dr. Rame Awd ("Dr. Awd") at MDC Brooklyn evaluated Plaintiff in connection with a fourteen (14)-day physician evaluation encounter.  (Id. ¶ 27.)  It does not appear that Plaintiff reported "a history of prostate cancer" at this time.  (Id.)  In addition, it was noted that Plaintiff refused a digital rectal exam.  (Id.)

On March 8, 2018, Dr. Awd noted that she reviewed lab work obtained on March 7th, which revealed that Plaintiff had a PSA level of 32.8.  (Id. ¶ 28.)  She planned to request a urology consult.  (Id.)  On April 4, 2018, Plaintiff had lab work performed at MDC Brooklyn. (Id. ¶ 29.)  His PSA level was 36.0.  (Id.)  Dr. Awd noted this lab result on April 6th.  (Id.)

On April 26, 2018, Plaintiff had an outside urology consult.  (Id. ¶ 31.)  Plaintiff reported undergoing a prostate biopsy about six (6) months before but not being given the results.  (Id.) The plan was to "expeditiously" obtain the results of the prostate biopsy, obtain a new PSA test,

---

[8]  Defendants do not describe Sapphire.  However, it appears that Sapphire is "[a]n [e]lectronic [h]ealth [r]ecord designed for correctional facilities."  See Sapphire Health, https://www.sapphire-health.com (last visited May 23, 2024).

and for Plaintiff to return in two (2) weeks.  (Id.); see (Doc. No. 119-2 at 398 (containing urology clinic note from Brooklyn Hospital, which stated: (1) Plaintiff reported during his appointment that he had a prostate biopsy from another facility, but was not given the results of the biopsy; (2) MDC Brooklyn must retrieve the results of the biopsy or document if the result was lost and, if so, order a new biopsy; and (3) this process needed to be done "expeditiously because of the possibility of undiagnosed and untreated cancer")).

On that same date, a nurse practitioner at MCD Brooklyn noted that she called SCI Mahanoy's medical department to request Plaintiff's medical records.  (Doc. No. 120 ¶ 30); see (Doc. No. 119-2 at 340 (containing BOP medical record, which states that per Plaintiff's urology appointment at the Brooklyn Hospital, the urologist was requesting that MDC Brooklyn obtain Plaintiff's biopsy report "with haste" because Plaintiff had reported he previously had prostate biopsy)).  Plaintiff signed an authorization for the release of his medical records, which was sent from MDC Brooklyn to SCI Mahanoy.  (Doc. Nos. 120 ¶ 30; 47 at 18.)  The following day, on April 27, 2018, Plaintiff's prostate biopsy results and other records were faxed from SCI Mahanoy to MDC Brooklyn.  (Doc. No. 120 ¶ 32.)

Shortly thereafter, on May 1, 2018, Dr. Rodgers placed a consult request for Plaintiff to be seen by Dr. Miceli for an oncology follow-up when next available.  (Id. ¶ 33.)  Dr. Rodgers noted that Plaintiff had a prostate biopsy completed in October 2017, demonstrating left lobe adenocarcinoma with a Gleason Score of 6 and right lobe Gleason Score of 6 or 7.  (Id.)  Dr. Rodgers also noted that Plaintiff had been on transfer out of the DOC to "ATA" since last fall. (Id.)

Back in New York, Plaintiff had a follow-up visit with an outside urologist on May 10, 2018, at the Brooklyn Hospital Center ("Brooklyn Hospital").  (Id. ¶ 34.)  The plan was to obtain a bone scan and CT scan with and without contrast.  (Id.)

Subsequently, on May 18, 2018, it was noted by Dr. Bruce Bialor ("Dr. Bialor") of MDC Brooklyn that Plaintiff was diagnosed with prostate cancer in October 2017, but "was no [sic] treated" and "did not receive any treatment because he [was] incarcerated and was transferred to another facility."  (Doc. No. 119-2 at 399.)  Also on May 18, 2018, Dr. Awd noted that Plaintiff was a poor historian.  (Doc. No. 120 ¶ 35.)  She indicated that he did not mention any issue about his prostate problem during her evaluation on February 7, 2018, or when she discussed his PSA result with him on March 7, 2018.  (Id.)  She also noted that Plaintiff refused a rectal exam on February 7, 2018, and that Plaintiff did not report any prostate issues during his intake on January 11, 2018.  (Id.)  She further noted that MDC Brooklyn obtained his medical records on April 27, 2018.  (Id.)

On May 23, 2018, Plaintiff underwent a bone scan and CT scan of his abdomen/pelvis at Brooklyn Hospital.  (Id. ¶ 36.)  The following day, Dr. Bialor noted that he reviewed the CT and bone scan reports, which showed an iliac bone lesion.  (Id. ¶ 37.)  He planned to defer to urology as to whether the lesion was consistent with metastasis or not.  (Id.)  A follow-up appointment with urology was "pending scheduling."  (Id.); see (Doc. No. 119-2 at 309 (stating that Plaintiff "needs appt for [sic] ASAP")).

On May 31, 2018, Dr. Bialor noted that he spoke with Dr. Lipansky of Brooklyn Hospital's Urology Clinic while Plaintiff was there.  (Doc. No. 120 ¶ 38.)  Dr. Lipansky reported that the bone scan showed one area of moderately abnormal radioactivity at the posterior aspect of the left iliac bone.  (Id.)  He explained that although solitary, the possibility of metastasis

13

should be considered and ruled out.  (Id.)  A PET CT scan and oncology consult were recommended.  (Id.)  If treatment was not needed for metastatic disease, Plaintiff could still be treated locally.  (Id.)

On June 1, 2018, Plaintiff was referred to oncology and a PET scan was ordered for further evaluation.  (Id. ¶ 39.)  On the same date, Dr. Bialor called SCI Mahanoy.  (Id. ¶ 40.)  He informed Steinhart at SCI Mahanoy about Plaintiff's prostate cancer diagnosis made in October 2017, while Plaintiff was in custody at SCI Mahanoy.[9]  (Id.; Doc. No. 119-2 at 306.)  Dr. Bialor informed Steinhart of the status of Plaintiff's work-up, i.e., that he was being scheduled for a PET CT scan because his bone scan was inconclusive.  (Doc. No. 119-2 at 306.)  It was noted that Plaintiff was a non-Bureau of Prisons inmate who was awaiting transport to state custody. (Id.)  Dr. Bialor planned to continue all necessary care until Plaintiff was transferred.  (Id.)

On June 5, 2018, Plaintiff underwent a PET CT scan.  (Doc. No. 120 ¶ 41.)  Notes dated June 7, 2018 from MDC Brooklyn show that this scan revealed no abnormal hypermetabolic activity to suggest malignancy at that time, and the plan was to follow up with an oncology evaluation per recommendation of consulting urologist.  (Id. ¶¶ 41, 42.)  Plaintiff had an oncology consult on June 20, 2018.  (Id. ¶ 43.)  Following an exam, the plan was to obtain an MRI of Plaintiff's pelvis.  (Id.)  In addition, Plaintiff was to bring copies of his biopsy reports to his next visit.  (Id.)

Dr. Bialor made further consult plans concerning additional treatment for Plaintiff.  (Id. ¶ 44.)  Dr. Bialor noted that Plaintiff's condition was stable and that he had a diagnosis of prostate cancer.  (Id.)  Dr. Bialor placed a consult with gastroenterology to follow up on a finding of

---

[9]  Dr. Bialor's notes reflect that Travers was also on this call and Dr. Rodgers was unavailable for the call.  (Doc. Nos. 120 ¶ 40; 119-2 at 306.)

abnormal gastric fundus referenced on the CT and PET CT scans, and he anticipated an esophagogastroduodenoscopy (EGD) scoping (also known as an upper endoscopy) to identify the nature/cause of any such abnormality.[10]  (Id.)  Dr. Bialor also ordered oncology and radiation oncology referrals to determine treatment, noting the PET scan's benign finding regarding metastasis.  (Id.)

On June 28, 2018, Plaintiff had a urology consultation at Brooklyn Hospital.  (Id. ¶ 45.) The plan was to consult with radiation oncology.  (Id.)

### 3. Plaintiff's Medical Treatment at SCI Mahanoy Prior to His Filing of a Grievance

On July 16, 2018, Plaintiff was returned to SCI Mahanoy.  (Id. ¶ 46.)  On August 7, 2018, Plaintiff had an outside urology visit with Dr. Pujara.  (Id. ¶ 48.)  Dr. Pujara noted that Plaintiff had prostate cancer, which was detected in October 2017, and he pointed out that Plaintiff was then transferred to a federal facility in Brooklyn, New York.  (Id.)  Dr. Pujara also noted that he did not have results of the studies recently obtained at Brooklyn Hospital.  (Id.)  Dr. Pujara explained to Plaintiff, at length, that if the metastatic workup was negative and the disease was localized to the prostate, the options were: (1) radiation; (2) brachytherapy; (3) surgical removal, radical (robotic) prostatectomy; (4) hormone therapy; and (5) observation.  (Id.)  Dr. Pujara also explained the pros and cons of all treatments and provided literature to Plaintiff.  (Id.)  The plan was for Plaintiff to discuss the options with his doctors at SCI Mahanoy and decide on a course of treatment.  (Id.)  Dr. Pujara planned to follow up with Plaintiff in six (6) months after he received treatment.  (Id.)

---

[10]  "An upper endoscopy, also called an upper gastrointestinal endoscopy, is a procedure used to visually examine [the] upper digestive system.  This is done with the help of a tiny camera on the end of a long, flexible tube."  Upper Endoscopy, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/endoscopy/about/pac-20395197 (last visited May 24, 2024).

Dr. Rodgers saw Plaintiff on August 7, 2018, upon his return from his visit with Dr. Pujara.  (Id. ¶ 49.)  Plaintiff told Dr. Rodgers that he felt comfortable going with the surgical option, i.e., a prostatectomy.  (Id.)  Plaintiff acknowledged understanding of the pros and cons of the options discussed that day.  (Id.)  Dr. Rodgers noted that he would be able to proceed with treatment of Plaintiff once his records were obtained from MDC Brooklyn.  (Id.)

### 4.    Plaintiff's Grievance Through its Ultimate Resolution

On August 14, 2018, Plaintiff submitted Grievance No. 752942.  (Id. ¶ 50.)  In his grievance, Plaintiff complained as follows:

> Deliberate indifference to serious medical needs.
>
> Ten (10) month's [sic] delay to his substantial risk of serious medical treatment has put me at greater risk toward the grading and staging process (Gleason Score).
>
> 1) Relief sought; [sic] A written apology toward the delaying in why the needed treatment has taken so long.
>
> 2) Relief sought; [sic] to receive adequate medical treatment for my illness.
>
> 3) Relief sought; [sic] No retaliation for exhausting my inhouse remedies by staff and or [sic] administration.

(Id.)  Plaintiff also explained that before filing his grievance, he communicated with medical staff via e-mail from outside SCI Mahanoy (i.e., when he was on writ), "wrote medical services (sick call via request form)," and "[w]rote Chief Medical Officer (via request form, but no response)."  (Id.)

An Initial Review Response from Kimberly Minarchick, RNS, dated September 7, 2018, denied Plaintiff's grievance. (Doc. No. 119-5 at 6–7.)  This Response stated:

> In review of your medical record, I see that you are being followed up and treated for prostate cancer.  Because of an abnormal lab value, you were consulted to a specialist on 8/17/17.  A specialist visit occurred because of this consult on August 22, 2017.  The specialist wanted a repeat of your lab and in a certain period and based on the result of this test, he would consider an ultrasound and biopsy of the

prostate.  You did have the biopsy of the prostate.  On November 2, 2017, the results of the biopsy were reported but not forwarded to the institution.  However, it was on that same day that you transferred to New York to a Federal Facility and was [sic] out of the Mahanoy institution until 7/16/18.

On January 29, 2018, you were to be seen in chronic clinic but you were still on WRIT [sic] at that time.  The doctor saw that your consult notes were not available in the computer.  She wrote to obtain the consult results and schedule you for MD line when you return.

Your biopsy report was obtained and scanned into the computer for review on 4/27/18 after SCI Mahanoy's request.

You returned to this institution on 7/16/18.  Your care resumed as prior before you leaving.  The practitioners here were made aware that while you were at the Federal Institution, you had a bone scan, CT scan and PET scan.  Upon receiving this information, the doctor here at Mahanoy put a [sic] request to have the records from these tests provided to us here so further treatment can be determined.  October 24, 2017, a consult was requested for you to be seen by a specialist after prostate cancer was suspected in September 2017.  Again, due to your departure from the institution, this consult was not completed until you returned and you saw the specialist on 8/7/18.  During this visit, the specialist explained your options and that you should discuss them with the institution physician.  Also, keep in mind, once you returned the specialist at his next available appointment accommodated an appointment.  Upon return from this appointment, our medical doctor spoke with you and you tentatively preferred a prostatectomy.  He explained that you will be seen by Oncology telemed and that we are still awaiting your medical records from the federal prison.

On 8/17/18, you did have your Oncology Telemed visit.  You were unsure of which therapy option to move forward with.  An MRI of your pelvis has been ordered. In addition, you were ordered an EGD.  You are scheduled for follow up with Dr. Miceli after your studies are completed at which point all options will be reviewed.  Your consults were ordered and you will have upcoming appointments.

Your follow up will continue and is appropriate.  I find no merit to allegations [sic] in this grievance[.]

(Id.)

On September 18, 2018, Plaintiff appealed from the denial of his grievance to the facility

manager.  (Id. at 8–9.)  In his appeal, Plaintiff asserted as follows:

Please be advise [sic], this appeal is in response to the "frivolous conclusion" toward deliberate indifference that have [sic] been found in instances where

medical personnel refused to provide or delayed needed medical treatment. Mr. Mills [sic] biopsy had been reported on November 2, 2017 which on the day of his departure on a federal writ, Mahanoy health services had received said biopsy report. Mr. Mills had reached out to Mahanoy in Troy N.Y. (RCJ) requesting (via e-mail) the information concerning his biopsy that Mahanoy was in possession of. To his dismay, Mahanoy health service [sic] only forward [sic] the previous PSA report, excluding the biopsy report that had been requested. Mr. Mills seem [sic] to be mislead [sic] during the time of request [sic] at RCJ, when it clearified [sic] in the grievance that the results were already reported doing [sic] his transfer from Mahanoy, via federal writ. Health services subjectively initiated the failure in not forwarding Mr. Mills [sic] medical records which the absent or deficient records create the possibility for disaster. In Mr. Mills [sic] case, the increase (Doubled) in his PSA levels allowing a greater chance in [sic] the cancer spreading. Eight (8) month's [sic] delay has stolen the rights of adequate medical care. Mahanoy health services is at fault for not following protocal [sic] an [sic] failure [sic] to transfer necessary medical records in a timely fashions [sic] to a serious medical need. Upon my returning to this institution on 7-16-18, my care resumed as prior to leaving. However, my PSA levels have taken a serious spike, putting me at greater risk-changing my quality of life. The critical facts was [sic] that the contractor (Doctor/urologist) was vested by the state with the authority and responsibility to meet the Constitution [sic] obligation to provide essential medical care to inmates. Therefore, the doctor/urologist acted under color of state law which [sic] blameworthy is not a solution to this obligation in support of Mr. Mills [sic] argument. I request that this appeal be revise [sic] and corrective measure [sic] be made in favorable [sic] to Mr. Mills. Please advise.

(Id.)

The facility manager denied Plaintiff's appeal via a Facility Manager's Appeal Response dated September 21, 2018. (Id. at 10.) The facility manager explained the denial as follows:

I am in receipt of your grievance appeal concerning your health care.

I have read the response provided to you by RNS Minarchick and I find it thorough and appropriate. Appeals exist to examine procedure, if you, the grievant, identify errors in the way your grievance was processed and responded to. It is not to have your complaint heard a second time, to add new complaints or to rebut the response received. I am not a medical professional and I must defer to those who are. In reading and reviewing the response provided, it is my belief that you are receiving the proper care from our Medical staff and are being followed carefully. It is no one's fault that you were away on Writ. Once you returned from Writ, your care continued.

Your appeal is therefore denied as well as any requested relief. I find no evidence of any deliberate indifference on the part of our medical staff.

18

(<u>Id.</u>)  It appears that Plaintiff received this denial on September 24, 2018.  (<u>Id.</u> at 11.)

Plaintiff appealed from the facility manager's decision by filing an Inmate Appeal to Final Review Grievance to the DOC Secretary's Office of Inmate Grievances & Appeals ("SOIGA") on September 28, 2018.  (<u>Id.</u>)  Plaintiff's "appeal statement" stated:

> Please be advise [sic], this appeal is in response to th [sic] frivolous conclusion toward deliberate indifference that have [sic] been found in instances where medical personnel refused to provide or delayed needed medical treatment.
>
> Ten (10) months delay to a substantial risk of serious medical treatment has put me at greater risk toward the grading and staging process (Gleason Score).
>
> Relief sought; [sic] to receive adequate medical treatment for my illness.
>
> Relief sought; [sic] A written apology toward the delay in why the needed treatment has taken so long.
>
> Relief sought; [sic] No retaliation for exhausting my in-house remedies by staff and administration.
>
> Also in reference to the facility Manager uphold response "it is no one's fault that I was away on writ," it is everyone [sic] fault when it comes down to adequate medical treatment. A federal writ should not withhold the due process in my serious medical needs, nor should my medical condition be deliberated [sic] indifference by putting me at greater risk in me exhausting my rights to the interstate agreement on detainers.

(<u>Id.</u>)

It appears that SOIGA identified issues with Plaintiff's appeal and notified him as such via an "Action Required" dated October 17, 2018.  (<u>Id.</u> at 12.)  Plaintiff seems to have resolved any issues with the form of his appeal because SOIGA's Chief Grievance Officer referred the appeal to the Bureau of Health Care Services ("BHCS") via a Grievance Referral dated November 7, 2018.  (<u>Id.</u> at 4.)

BHCS responded to the Chief Grievance Officer via a letter dated December 6, 2018.

(Id. at 2.)  This letter stated in relevant part that

> Mr. Mills' concern of not being provided proper medical care for his prostate cancer
> was reviewed by the staff at [BHCS.  BHCS has reviewed the medical record and
> has determined the medical care being provided is reasonable and appropriate.
>
> The findings of this review concur with the Initial Review Response dated
> September 7, 2018.  Mr. Mills is encouraged to participate in his established
> oncology treatment plan and to discuss his concerns or changes of condition with
> his attending physician, oncology and urology specialists.  No evidence of wrong
> doing [sic] was identified.

(Id.)

SOIGA ultimately denied Plaintiff's "appeal and any requested relief" via a Final Appeal

decision issued on December 10, 2018.  (Id. at 1.)  SOIGA's Final Appeal Decision explained

the denial as follows:

> This office is in receipt of your appeal, has reviewed all applicable documents and
> consulted with relevant professional staff.  In your grievance, you assert that you
> have medical conditions for which treatment was delayed for 10 months.  You
> assert that this alleged delay has placed you as [sic] a greater risk for serious
> medical harm.  You call this deliberate indifference and seek an apology, adequate
> treatment, and not to be subjected to retaliation.
>
> A review of the records by [BHCS] reflects that the medical care provided was
> reasonable and appropriate.  The findings of the review concur with the Initial
> Review Response.  You are encouraged to participate in your treatment plan and to
> discuss your concerns or changes of condition with a practitioner, oncology, and
> urology specialists.  No evidence of wrong doing [sic] was identified.  Based on the
> review, your appeal and any requested relief is [sic] denied.
>
> It is noted that you erroneously believe that your grievance was deemed frivolous.
> A grievance deemed frivolous would have an "X" or checkmark in the box next to
> that determination.  Your grievance was not deemed frivolous.

(Id.)

This was the only grievance Plaintiff pursued through the final step to SOIGA by the

time this lawsuit was filed on or about February 3, 2020.  (Doc. Nos. 120 ¶ 50; 52 at 21.)

5.      **Plaintiff's Medical Treatment at SCI Mahanoy After He Filed His Grievance**

From mid-August 2018, through early February 2019, Plaintiff had, inter alia, (1) several visits with Drs. Miceli, Rodgers, and Pujara, as well as PA Williams; (2) an MRI of his pelvis; (3) an EGD at Geisinger Medical Center ("GMC"), which included a biopsy; (4) PSA level tests; (5) a consultation with outside urology at GMC; (6) a bone scan and CT scan of his abdomen/pelvis; and (7) a biopsy of Plaintiff's left iliac crest (i.e., the top of his pelvic bone). (Doc. Nos. 120 ¶¶ 51–76; 119-2 at 177, 292.)  It was determined that Plaintiff's prostate cancer was localized.  (Doc. No. 120 ¶ 73.)  On February 6, 2019, a GMC doctor performed a robotic-assisted laparoscopic radical prostatectomy on Plaintiff.[11]  (Doc. No. 120 ¶¶ 78, 79.)  On February 9, 2019, Plaintiff was discharged from GMC and returned to SCI Mahanoy, where he was housed in the infirmary for approximately four days.  (Id. ¶¶ 81–85.)  Thereafter, Plaintiff was transferred to general population, and he received significant medical care for any post-surgery issues and other medical issues from medical professionals inside and outside SCI Mahanoy until his transfer out of DOC custody on February 17, 2021.  (Id. ¶¶ 86–131.)  Since his departure from DOC custody, Plaintiff's prostate cancer has been in remission.  (Id. ¶ 135.)

---

[11]  A "[p]rostatectomy is surgery to remove part or all of the prostate gland."  See Prostatectomy, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/prostatectomy/about/pac-20385198 (last visited May 24, 2024).  "Most often, [a] prostatectomy is done to treat localized prostate cancer," and a "[r]adical prostatectomy is surgery to remove the entire prostate gland and surrounding lymph nodes to treat men with localized prostate cancer."  See id.  In a robotic-assisted radical prostatectomy,

> [t]he surgeon makes five to six small incisions in [a patient's] lower abdomen to remove the prostate.  He or she sits at a console, using instruments attached to a computer-assisted mechanical device (robot).  The robotic device allows a more precise response to movement of the surgeon's hands.

See id.

## II.   LEGAL STANDARD

The Court must render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson, 477 U.S. at 257.  When determining whether there is a genuine dispute of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See id. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor.").

To avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations of their pleadings.  When the party seeking summary judgment satisfies their burden to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions, answers to interrogatories, and the like" to show specific material facts giving rise to a genuine dispute.  See Celotex Corp., 477 U.S. at 324; id. at 328 (White, J., concurring).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)

(citation omitted).  Instead, they must produce evidence to show the existence of every element essential to their case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex Corp., 477 U.S. at 323; see also Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992) (explaining that since plaintiff had the burden of proof, "he must make a showing sufficient to establish the existence of every element essential to his case" (citations omitted)).

As noted supra, when determining whether a dispute of material fact exists, the Court must consider the evidence in the light most favorable to the non-moving party.  See Matsushita Elec. Indus. Co., 475 U.S. at 588 (citation omitted).  In doing so, the Court must "accept the non-movant's allegations as true and resolve any conflicts in [their] favor."  See White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988), abrogated on other grounds by Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."  See L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that they are a pro se litigant because these rules apply with equal force to all parties.  See Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

Even if the Court deems the facts in the moving party's submission to be admitted due to the nonmoving party's failure to comply with Local Rule 56.1, the Court cannot simply grant the motion for summary judgment as unopposed.  Instead, the Court can only grant the motion if the Court "find[s] that judgment for the moving party is 'appropriate.'" Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990). The analysis for determining whether judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law. Where the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

Id. (citing Celotex Corp., 477 U.S. 317).

## III.   DISCUSSION

Defendants seek summary judgment on all claims asserted against them in the amended complaint.  (Doc. No. 124 at 2.)  Regarding Plaintiff's deliberate indifference claims, they argue that "the facts of record demonstrate that [they] provided timely and constitutionally appropriate medical treatment to [Plaintiff] while he was under their care, notwithstanding his transfer between prison systems, and he has been cured of cancer, with no delays in treatment."  See (id. at 2, 14–16).  As for Plaintiff's due process claims, Defendants contend that summary judgment is appropriate because those claims "are merely duplicative of his [Eighth] Amendment claims." See (id. at 2, 16–17).  Concerning Plaintiff's breach of contract claim against Wellpath, Defendants maintain that he lacks standing to raise a claim relating to "the Commonwealth's contract for correctional medical services with Wellpath."  See (id. at 2, 17–19).  Finally,

Defendants argue that they are entitled to summary judgment on all claims because Plaintiff failed to exhaust his administrative remedies in violation of the Prison Litigation Reform Act ("PLRA").  (See id. at 2–3, 19–24.).  Although this is Defendants' final argument, the Court will address it first because it is dispositive of most of Plaintiff's claims and requests for relief.

A.      **Exhaustion of Administrative Remedies for Section 1983 Claims**

Defendants contend that they are entitled to summary judgment on all claims in the amended complaint due to Plaintiff's failure to exhaust his administrative remedies as required by the PLRA.  Preliminarily, the Court notes that even though Defendants argue that Plaintiff's failure to exhaust warrants summary judgment on all claims, any such failure would impact only his Section 1983 claims.  More specifically, the PLRA's exhaustion requirement mandates that "[n]o action shall be brought with respect to prison conditions under **[S]ection 1983 of this title, or any other Federal law**, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  See 42 U.S.C. § 1997e(a) (emphasis added).  In other words, exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding their prison conditions. See Rinaldi v. United States, 904 F.3d 257, 265 (3d Cir. 2018); see also Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))); Jones v. Bock, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted) (alteration added)); Booth v. Churner, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over

prison conditions" (quoting 42 U.S.C. § 1997e(a))).  Therefore, the Court addresses Defendants'

exhaustion argument as applying only to Plaintiff's Section 1983 claims and not his breach of

contract claim against Wellpath.

### 1.    The PLRA's Requirements for Proper Exhaustion of Administrative Remedies

The Court turns now to the requirements of the PLRA.  "The PLRA requires proper

exhaustion, meaning 'complet[ing] the administrative review process in accordance with the

applicable procedural rules.'"  Downey v. Pa. Dep't of Corr., 968 F.3d 299, 305 (3d Cir. 2020)

(alteration in original) (quoting Woodford, 548 U.S. at 88).  "These applicable procedural rules

are supplied by the individual prisons."  Id. (citations omitted); see also Spruill v. Gillis, 372

F.3d 218, 222 (3d Cir. 2004) (stating that "the determination [of] whether a prisoner has

'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the

prison's administrative regulations governing inmate grievances"); Jones, 549 U.S. at 218

(explaining that [t]he level of detail necessary in a grievance to comply with the grievance

procedures will vary from system to system and claim to claim"); Woodford, 548 U.S. at 90

(indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other

critical procedural rules").

A prisoner's failure to follow a prison's procedural rules will result in a procedural

default of their claims.  See Spruill, 372 F.3d at 230–32 (concluding that PLRA's exhaustion

requirement includes procedural default component); see also Drippe v. Tobelinski, 604 F.3d

778, 781 (3d Cir. 2010) (pointing out that Spruill held "that the PLRA includes a procedural

default component and the determination whether a prisoner properly exhausted a claim is made

by evaluating compliance with the prison's specific grievance procedures").  A procedural

default may be excused, however, if the prisoner can show that the administrative remedies were

unavailable to them.  <u>See</u> <u>Rinaldi</u>, 904 F.3d at 266 ("The PLRA requires only 'proper

exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'" (quoting

<u>Woodford</u>, 548 U.S. at 93)).  "An administrative remedy is unavailable when it 'operates as a

simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or

when prison administrators thwart inmates from taking advantage of a grievance process through

machination, misrepresentation, or intimidation.'" <u>Downey</u>, 968 F.3d at 305 (alterations in

original) (quoting <u>Shifflett v. Korszniak</u>, 934 F.3d 356, 365 (3d Cir. 2019)).

 The failure to exhaust available administrative remedies "is an affirmative defense under

the PLRA."  <u>See</u> <u>Jones</u>, 549 U.S. at 216.  As such, "[t]he burden to plead and prove failure to

exhaust as an affirmative defense rests on the defendant."  <u>See</u> <u>Rinaldi</u>, 904 F.3d at 268 (citing

<u>Ray v. Kertes</u>, 285 F.3d 287, 295 (3d Cir. 2002)).  However, "once the defendant has established

that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show

that such remedies were unavailable to [them]."  <u>See</u> <u>id.</u> (citation omitted).

 Finally, requiring a prisoner to exhaust available administrative remedies before filing

suit in federal court advances the policy justifications of the PLRA, <u>i.e.</u>, to "return[] control of

the inmate grievance process to prison administrators, encourag[e] the development of an

administrative record, and perhaps settlements, within the inmate grievance process, and reduc[e]

the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits."  <u>See</u>

<u>Downey</u>, 968 F.3d at 305 (citation and internal quotation marks omitted); <u>Jones</u>, 549 U.S. at 204

(explaining that exhaustion requirement "allows prison officials an opportunity to resolve

disputes concerning the exercise of their responsibilities before being haled into court").  It also

"reduces any incentive that prison officials otherwise might have to use threats to prevent

inmates from exhausting their administrative remedies and thereby safeguards the benefits of the

administrative review process for everyone."  See Rinaldi, 904 F.3d at 268 (citation and internal

quotation marks omitted).

Here, the applicable grievance policy is DC-ADM 804.  See (Doc. No. 119-6 at ¶ 2

("DC-ADM 804 outlines the necessary three-step process of the grievance procedure.")); see

also DC-ADM 804, available at https://www.cor.pa.gov/About%20Us/-

Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf (last visited May 24, 2024).

Under DC-ADM 804, the DOC requires every inmate in its custody to "have access to a formal

procedure" through which the inmates can "seek resolution of problems or other issues of

concern arising during the course of [their] confinement."  See DC-ADM 804, Policy Statement,

§ 3.

The DOC refers to its "formal procedure" as the "Inmate Grievance System" (id.), and it

is comprised of three (3) separate steps (id., Inmate Grievance System Procedures Manual, §§ 1-

2).  The first step requires the inmate to submit a written grievance to the Facility Grievance

Coordinator or designee, usually the Superintendent's Assistant, within fifteen (15) working days

after the event upon which the grievance is based.  (Id., Inmate Grievance System Procedures

Manual at § 1, A.8.)  For the second step, the inmate must appeal an initial review

response/rejection to the Facility Manager or designee within fifteen (15) working days from the

date of the initial review response/rejection.  (Id. at § 2, A.1.a.)  For the third step, if the inmate

"is dissatisfied with the disposition of an appeal from the Facility Manager/designee," they must

"submit an Inmate Appeal to Final Review" to SOIGA within fifteen (15) working days of the

date of the Facility Manager/designee's decision.  (Id. at § 2, B.1.b.)

### 2.      Identifying or Naming of Defendants

In this case, the undisputed material facts reflect that Plaintiff submitted one grievance

pertaining to his medical care at SCI Mahanoy—i.e., Grievance No. 752942.  (Doc. Nos. 120 ¶

150; 119-5 at 5.)  Defendants acknowledge, and the summary judgment record reflects, that

Plaintiff pursued this grievance through all three (3) steps of DC-ADM 804.  (Doc. Nos. 119-5;

120 ¶ 150; 124 at 20.)  However, Defendants argue that this grievance fails to identify or name

any of them, as required by DC-ADM 804.  (Doc. No. 124 at 20.)  The Court agrees with

Defendants that Plaintiff's Section 1983 claims against them are unexhausted because they are

procedurally defaulted and there is no cause to excuse the procedural default.

DC-ADM 804 requires an inmate's grievance to include "a statement of the facts relevant

to the claim" and to "identify individuals directly involved in the event(s)."  See DC-ADM 804,

§ 1(A)(11).  Here, Plaintiff's initial grievance does not identify any of the Defendants by name.

(Doc. No. 119-5 at 5.)  Instead, Plaintiff indicates that his "actions taken" and "staff [he had]

contacted" were: (1) He "[c]ommunicated by medical staff via E-mail from outside institution

(writ)"; (2) He "wrote medical services (sick call via Request form)"; and (3) He "wrote Chief

Medical Officer (via request form – no response)."  (Id.)

These descriptions are insufficient to identify Defendants for purposes of exhaustion.

The Court recognizes that exhaustion has been found even though a plaintiff did not include a

defendant's name in a grievance where the plaintiff provided a functional description of the

individual's job.  See, e.g., Williams v. Beard, 482 F.3d 637, 638, 640 (3d Cir. 2007)

(concluding that plaintiff's description of the "'2-10' staff of the cell block" to be sufficient

identification of defendants).  However, such a finding is also dependent on the sufficiency of

the other facts included in the grievance.  See Travillion v. Wetzel, 765 F. App'x 785, 789 (3d

Cir. 2019) (unpublished) (pointing out that plaintiff "specified the date, location, and relevant facts related to his claim, as is . . . required by DC-ADM 804 § 1(A)(11)" and concluding that if district court found that plaintiff's identification of certain defendants as "RHU Staff and Unit Management" was sufficient for exhaustion purposes, his identification of other defendants as "SCI-Rockview staff and/or administration" was also sufficient to comply with the identification requirement of DC-ADM 804 § 1(A)(11)); Perez v. Reno, No. 22-cv-01021, 2023 WL 6051258, at *2 (M.D. Pa. Sept. 15, 2023) (determining that plaintiff's reference to "the 2-10 shift officer" was sufficient identification where grievance also provided specific information about date, time, and actions of assault by other inmate).

In this case, Plaintiff did not provide specific information about the date, time, and location of relevant facts in his initial grievance.  Instead, his facts consisted of only the following: "Ten (10) month's [sic] delay to his substantial risk of serious medical treatment has put me at greater risk toward the grading and staging process (Gleason Score)." (Doc. No. 120 ¶ 50.)  Due to this bare factual description of the basis of his claim, along with the failure to specifically name any of the remaining Defendants in his initial grievance, Plaintiff has failed to satisfy the identification requirements of DC-ADM 804.[12]

Generally, a plaintiff's failure to name a defendant in their grievance would result in a procedural default of any claim against them.  See Spruill, 372 F.3d at 234 (explaining that plaintiff's failure to name defendant in initial grievance, despite DC-ADM 804 requiring prisoners to identify "facts relevant to the claim," meant any claim against that defendant was

_____

[12]  To the extent that any named Defendant in this action is potentially identifiable from Plaintiff's grievance documents, it would be only the already-dismissed Dr. Pujara.  In his appeal to the Facility Manager, Plaintiff appears to blame the "contractor (Doctor/urologist)" for the delay in his records being transmitted.  (Doc. No. 119-5 at 8.)

procedurally defaulted unless otherwise excused); Byrd v. Shannon, 715 F.3d 117, 127 (3d Cir. 2013) (concluding prisoner failed to exhaust by not naming defendant in grievance as required by DC-ADM 804).  However, "an inmate's procedural default may be excused if the prison identifies the persons involved and 'they were fairly within the compass of the prisoner's grievance.'"  See Pressley v. Miller, No. 21-2826, 2022 WL 17414866, at *2 (3d Cir. Dec. 5, 2022) (unpublished) (quoting Spruill, 372 F.3d at 234)); see also Wood v. Detwiler, 782 F. App'x 103, 105 n.3 (3d Cir. 2019) (unpublished) (stating (in dicta) that plaintiff's failure to name defendants in his grievances was "not dispositive as to whether he properly administratively exhausted his claims" because defendants' identities were "known throughout the grievance procedure").  In addition, a court can excuse the procedural default if the prison's actions after receiving the grievance reveal knowledge of the individuals involved in the grievance despite plaintiff failing to specifically name them.  See, e.g., Diaz v. Palakovich, 448 F. App'x 211, 217 (3d Cir. 2011) (unpublished) (determining that any procedural default due to plaintiff's "failure to name individuals working in the SCI-Smithfield mailroom . . . was excused by SCI-Smithfield's Initial Review Response indicating that the grievance officer went 'to the Mailroom to discuss the issue with the mailroom staff'"); Primus v. Wetzel, No. 19-cv-01597, 2021 WL 4226018, at *2 n.15 (M.D. Pa. Sept. 16, 2021) (concluding that plaintiff's failure to specifically identify defendant in grievance was excused because plaintiff accused "Unit Staff" of failing to protect in grievance and grievance officer investigated this claim "by interviewing unit staff").

Here, any procedural default is not excused because it does not appear that the grievance officer or any other individual involved in the grievance process ever spoke to anyone at SCI Mahanoy, including Defendants, about Plaintiff's claim. Instead, it appears that only a review of Plaintiff's medical records occurred.  See (Doc. No. 119-5 at 6–7 (providing reasons for rejection

31

of claim after "review of your medical record")).  In addition, Dr. Rodgers and PA Williams's names were not identified in the grievance officer's response or in any response to Plaintiff as he pursued his grievance appeals.[13]  See, e.g., Wojnarowski v. Wetzel, No. 19-cv-00174, 2022 WL 2116707, at *6 (W.D. Pa. May 10, 2022) (finding that plaintiff's procedural default was not excused where prison system never identified defendants by name or acknowledge that they were within the scope of plaintiff's grievance at any point in grievance process through grievance's final review). Although Dr. Miceli's name was mentioned in the Initial Review Response, it was referenced only to state that Plaintiff had a future follow-up appointment after his studies were completed.  (Doc. No. 119-5 at 7.)  It was not referenced as being related to the delay in reporting Plaintiff's biopsy results to the New York correctional institutions, and there is no indication that Dr. Miceli was interviewed about Plaintiff's claim in the grievance.  Further, there is no indication that the grievance officer was acknowledging that Dr. Miceli was within the scope of Plaintiff's grievance by this reference in the Initial Review Response.  Therefore, Plaintiff's claims against Defendants are procedurally defaulted due to his failure to name them in his grievance and there is no cause to excuse this procedural default.  See Timmons v. Walters, No. 20-cv-02393, 2023 WL 8720670, at *6 (M.D. Pa. Dec. 18, 2023) (granting summary judgment for several defendants due to Plaintiff's failure to name them in any grievance).

---

[13]  In SOIGA's Final Appeal Decision, it mentioned that it had "reviewed all applicable documents and consulted with relevant professional staff."  (Doc. No. 119-5 at 1.)  There is no indication or reasonable inference from SOIGA's statement that it "consulted with relevant professional staff" that it spoke to Defendants about Plaintiff's grievance.  Instead, the only reasonable inference is that this was a reference to BHCS, to which it had referred Plaintiff's final appeal and referenced in its Final Appeal Decision.

###### B.    Plaintiff's Requests for Relief

Even if the procedural default of Plaintiff's Section 1983 claims was excused, Plaintiff could not obtain any relief on these claims because he failed to exhaust any request for money damages, declaratory relief, or nominal damages, and his requests for injunctive relief in the amended complaint are either moot or not viable.[14]  Turning first to Plaintiff's failure to exhaust his request for money damages, on the standard grievance form that Plaintiff used to complete Grievance No. 752942, it explicitly directs inmates (such as Plaintiff) to "[s]tate all relief that [they are] seeking."  (Doc. No. 119-5 at 5.)  In addition, it explicitly refers inmates to DC-ADM 804 for the "procedures on the inmate grievance system" (id.), which, in turn, provides that, "[i]f the inmate desires compensation or **other legal relief normally available from a court**, the inmate must request the specific relief sought in his/her initial grievance."  See DC-ADM 804 § 1(A)(11) (emphasis added).  Plaintiff, in other words, was clearly on notice that his initial

---

[14]  Defendants raised an argument relating to Plaintiff's failure to exhaust any request for money damages (Doc. No. 124 at 24), but they did not address his other claims for relief, see generally (id. at 1–24).  Nevertheless, the Court may address the viability of Plaintiff's remaining requests for relief sua sponte.  See 42 U.S.C. § 1997e(c)(1) ("The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief."); Beenick v. LeFebvre, 684 F. App'x 200, 204–05 (3d Cir. 2017) (unpublished) (concluding district court "correctly exercised its authority to dismiss . . . claim" sua sponte at summary judgment stage pursuant to section 1997e(c)(1)); see also Goodwin v. Castille, 465 F. App'x 157, 163 (3d Cir. 2012) (unpublished) (explaining that "sua sponte dismissal under Rule 12(b)(6) is proper even after service of process, Oatess v. Sabolevitch, 914 F.2d 428, 430 (3d Cir. 1990), but that it should be exercised with caution to ensure that the decision to dismiss is an informed one, Briscoe v. Klaus, 538 F.3d 252, 258 (3d Cir. 2008)," and concluding the district court properly sua sponte dismissed Plaintiffs' claim because it "had sufficient facts to determine that legislative immunity was an absolute bar to [Plaintiffs'] action" and "[Plaintiffs] could present no additional facts that would militate against a finding of legislative immunity").

grievance must comply with DC-ADM 804 and must also include any request for compensation or other legal relief.

As already noted, the undisputed material facts reflect that Plaintiff requested the following forms of relief in his initial grievance:

1)      Relief sought: a written apology toward the delay in why the needed treatment has taken so long.

2)      Relief sought: to receive adequate medical treatment for my illness.

3)      Relief sought: no retaliation for exhausting my inhouse remedies by staff and or administration.

(Doc. No. 119-5 at 5.)  These (3) items are the only forms of relief that Plaintiff sought in his initial grievance.  (See id.).

In this case, Plaintiff seeks, inter alia, compensatory and punitive damages.  (Doc. No. 52 at 24.)  However, because Plaintiff did not make a request for monetary damages in his initial grievance, see (Doc. No. 119-5 at 5), and no request for money damages was ever addressed by SOIGA on the merits, he is now foreclosed from seeking these forms of monetary damages here. See, e.g., Wright v. Sauers, 729 F. App'x 225, 227 (3d Cir. 2018) (unpublished) (noting that prisoner-plaintiff's claim for monetary damages in federal court was procedurally defaulted under DC-ADM 804 because he failed to request monetary damages in his initial grievance with the DOC); Endrikat v. Ransom, No. 21-cv-01684, 2023 WL 3609157, at *4 (M.D. Pa. May 23, 2023) (discussing the requirements of DC-ADM 804 and concluding as follows: "by failing to request monetary damages in his initial grievance, [prisoner-plaintiff] failed to exhaust administrative remedies with respect to his claim for monetary damages"), aff'd sub nom. Endrikat v. Little, No. 23-2167, 2023 WL 8519196 (3d Cir. Dec. 8, 2023).  But see Bailey v. Yoder, No. 20-cv-01836, 2023 WL 7329526, at *3 (M.D. Pa. Nov. 7, 2023) (concluding

34

plaintiff's claim for money damages was exhausted even though Plaintiff failed to include claim in original grievance because he sought money damages as part of his appeal and this request was considered on appeal and denied on its merits).

As for Plaintiff's other claims for relief in the amended complaint, he seeks declaratory relief and injunctive relief on his official capacity claims, as well as nominal damages on his individual capacity claims.  (Doc. No. 52 at 24.)  Regarding his claims for declaratory relief and nominal damages, Plaintiff did not indicate that he was seeking declaratory relief or nominal damages at any point during the grievance process.  Therefore, as with his request for monetary damages, he failed to exhaust any requests for declaratory relief or nominal damages.  See Nelson v. Hauser, No. 22-cv-00686, 2023 WL 8602286, at *4 (M.D. Pa. Dec. 12, 2023) (concluding plaintiff failed to exhaust requests for declaratory relief and nominal damages, which were "the only types of relief possibly available in the instant lawsuit," because he failed to request declaratory relief or nominal damages in his grievance).[15]  Accordingly, the Court will dismiss any requests for declaratory relief or nominal damages.

Concerning any claims for injunctive relief, Plaintiff's second and third requests for relief in his initial grievance—to receive adequate medical treatment and not be retaliated against by

---

[15]  In Nelson, Chief Judge Matthew W. Brann pointed out that:

> under Third Circuit precedent, nominal damages do not need to be alleged in the complaint. See Mitchell v. Horn, 318 F.3d 523, 533 n.8 (3d Cir. 2003) (citing Allah v. Al-Hafeez, 226 F.3d 247, 251 (3d Cir. 2000)). Consequently, it is unclear whether a request for such damages must be administratively exhausted. But cf. Everett v. Robinson, 2023 WL 6458850 (3d Cir. 2023) (nonprecedential) (finding that claims for "monetary damages and injunctive relief" were procedurally defaulted because they were not raised in prisoner's "initial grievance, as required by DC-ADM 804" and because prisoner failed to complete DOC's appeal process).

2023 WL 8602286, at *4 n.50.

staff or the administration because he exhausted his "inhouse remedies"—are mooted by Plaintiff

no longer being incarcerated at SCI Mahanoy.  As such, the only remaining form of requested

injunctive relief is an apology from Defendants.  Unfortunately for Plaintiff, an apology is not a

cognizable form of relief (injunctive or otherwise) in a Section 1983 action:

> The remedy of an apology . . . is not cognizable relief under § 1983, or as a general
> legal remedy under any provision of federal law.  See McKee v. Turner, 491 F.2d
> 1106, 1107 (9th Cir. 1974) ("We are not commissioned to run around getting
> apologies."); see also Woodruff v. Ohman, 29 Fed. App'x 337, 346 (6th Cir. 2002)
> ("Here, the district court exceeded its equitable power when it ordered [the
> defendant] to apologize.... The law ... is not usually concerned with procuring
> apologies to make morally right a legal wrong done to the plaintiff."); Kitchen v.
> Essex Cty. Corr. Facility, Civil Action No. 12-2199 (JLL), 2012 WL 1994505, at
> *4 (D.N.J. 2012) (collecting cases); Norris v. Poole, C/A No. 8:10-750-JFA-BHH,
> 2010 WL 1903970, at *3 (D.S.C. Apr. 19, 2010) (recognizing that a plaintiff "has
> no legal right to [an] apology"), report and recommendation adopted by 2010 WL
> 1903971 (D.S.C. May 11, 2010); Burkes v. Tranquilli, Civil Action No. 08-474,
> 2008 WL 2682606, at *4 (W.D. Pa. July 2, 2008) ("To the extent that Plaintiff's
> requested relief regarding an apology can be construed as a request for injunctive
> relief against the Defendants, such a claim for injunctive relief fails to state a claim
> as a matter of law.").

Al Hadidi v. Jones, No. 22-cv-00861, 2022 WL 21757151, at *3 (M.D. Pa. June 7, 2022) (all

alterations other than first alteration in original), report and recommendation adopted sub nom.

Hadidi v. Jones, No. 22-cv-00861, 2022 WL 21757149 (M.D. Pa. Aug. 11, 2022); see also

Devonish v. Atl. County Just. Facility, No. 10-cv-01866, 2010 WL 3024858, at *3 (D.N.J. July

29, 2010) ("[T]he remedy of 'apology' is not cognizable, either within the meaning of a Section

1983 action or as a general legal remedy that a court has the power to order, under any

provision." (citing Woodruff, 29 F. App'x at 346)); Tyler v. City of Henderson, KY, No. 21-cv-

P114, 2022 WL 1110337, at *2 (W.D. Ky. Apr. 13, 2022) ("Plaintiff's request for injunctive

relief in the form of an apology fails to state a claim." (citing Woodruff, 29 F. App'x at 346;

Burkes, 2008 WL 2682606, at *4)).  Thus, the Court must dismiss Plaintiff's request for an

apology from Defendants as well.

This leaves Plaintiff with no forms of relief available on his Section 1983 claims against Defendants even if the Court found he exhausted these claims or that any procedural default of those claims was excused. Accordingly, the Court will grant Defendants' motion for summary judgment as to Plaintiff's Section 1983 claims.

### C.      Plaintiff's Breach of Contract Claim

In his amended complaint, Plaintiff asserts a breach of contract claim against Defendant Wellpath, asserting that he is a third-party beneficiary to the contract between the DOC and Defendant Wellpath. (Doc. No. 52 at 21.) In light of the Court's resolution of Plaintiff's Section 1983 claims, there is currently no viable federal claim before the Court supporting the exercise of supplemental jurisdiction over Plaintiff's state-law breach of contract claim. See 28 U.S.C. 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (stating that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so"). The Court finds that consideration of "judicial economy, convenience, and fairness to the parties" does not "provide an affirmative justification" for retaining jurisdiction over Plaintiff's breach of contract claim. See Hedges, 204 F.3d at 123. Accordingly, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state-law breach of contract claim and dismiss that claim.

**IV.     CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment as to Plaintiff's Section 1983 claims.  (Doc. No. 119.)  The Court will also decline to exercise supplemental jurisdiction over Plaintiff's breach of contract claim and dismiss that claim.  An appropriate Order follows.


s/ Yvette Kane_____
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania